**ORAL ARGUMENT NOT YET SCHEDULED**

No. 14-5036

───────────────────────

**UNITED STATES COURT OF APPEALS FOR THE
DISTRICT OF COLUMBIA CIRCUIT**

───────────────────────

FLORIDA BANKERS ASSOCIATION and TEXAS BANKERS ASSOCIATION,
*Appellants,*

*v.*

UNITED STATES DEPARTMENT OF TREASURY, *et al.*
*Appellees*

On Appeal From The United States District Court
For The District of Columbia

──────────

**BRIEF FOR APPELLANTS**

──────────

James J. Butera
Ryan D. Israel
Jones Walker LLP
499 S. Capitol Street, SW
Suite 600
Washington, DC 20003
Tel:  (202) 203-1000
jbutera@joneswalker.com
risrael@joneswalker.com

Stephen C. Leckar
Kalbian Hagerty LLP
888 17th Street, NW
10th Floor
Washington, DC 20006
Tel:  (202) 223-5600
sleckar@kalbianhagerty.com

*Counsel for Appellants*
*Florida Bankers Association and Texas Bankers Association*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel certify that:

**A.    Parties and Amici**

The parties in this case are Appellants Florida Bankers Association ("FBA") and Texas Bankers Association ("TBA").  Appellees are the United States Department of the Treasury; Jack Lew, in his capacity as Secretary of the Treasury; the Internal Revenue Service; and John Koskinen, in his capacity as Commissioner of the Internal Revenue Service.

Appellants FBA and TBA were Plaintiffs in the proceedings in the District Court for the District of Columbia, and Appellees were Defendants.

No parties sought to intervene as Plaintiffs or Defendants in the District Court.

Counsel for Appellants are not aware of any *amici.*

**B.    Rulings Under Review**

The ruling of the District Court (Judge James E. Boasberg) under review is the District Court's Order and Entry of Judgment dated January 13, 2014 [D.D.C. Docket Entry No. 27] in Docket No. 13-cv-00529 (App. 1), and accompanying Memorandum Opinion [D.D.C. Docket Entry No. 28], dated January 13, 2014 (App. 7) and available at 2014 U.S. Dist. LEXIS 3521, which granted the Appellees' motion for summary judgment.

i

The action in the District Court challenged final amendments promulgated by the Appellees in Docket No. IRS-2011-0001. The Final Regulations are published at 77 Fed. Reg. 23391 (April 19, 2012) (App. 216).

**C.    Related Cases**

This case has not previously been before this Court or any other court, other than the District Court.

Appellants are not aware of any other related cases pending before this or any other court.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of this Court's Rules, Appellants Florida Bankers Association ("FBA") and Texas Bankers Association ("TBA") submit the following corporate disclosure statement.

FBA is a non-profit trade association organized under the laws of Florida, with its principal place of business in Florida.  FBA has no parent company, and no publicly-held company has a 10% or greater ownership interest in FBA.  FBA represents the interests of small and large commercial banks and savings associations headquartered or doing business in the State of Florida.

TBA is a non-profit trade association organized under the laws of Texas, with its principal place of business in Texas.  TBA has no parent company, and no publicly-held company has a 10% or greater ownership interest TBA.  TBA represents the interests of small and large commercial banks and savings institutions headquartered or doing business in the State of Texas.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT…....…………….…........................1

STATEMENT OF ISSUES………………………………………………3

STATUTORY AND REGULATORY PROVISIONS INVOLVED……5

CONCISE STATEMENT OF THE CASE………………………………6

STATEMENT OF FACTS…………………………………………12

      A.    Policy background………………………………………12

      B.    Amount of deposits………………………..…...........12

      C.    Chronology of the rule………………………………14

      D.    Post-NPRM developments……………………….......16

           1.    The written comments overwhelmingly
               opposed the 2011 Proposal…………………………16

           2.    The testimony at the Public Hearing opposed
               the 2011 Proposal………..………………………16

           3.    The IRS's erroneous claims to congressional
               support for the 2011 Proposal..................20

           4.    The IRS's changes to the 2011 Proposal were
               insignificant……………………………………..22

SUMMARY OF ARGUMENT………………………………………25

STANDING………………………………………………………..28

iv

ARGUMENT…………………………………………………………28

    I.      Standard of Review……………………………………….. …28

    II.     Argument and authority…………………………………………28

         A.     The 2012 amendment lacked reasoned decision
                making…………………………………………………...30

             1.     The IRS ignored its own evidence on capital
                      flight………………………………………… ..30

             2.     The IRS also failed to consider and analyze
                      existing procedures for collecting bank deposit
                      information………………………………………30

             3.     The IRS failed to adequately address the reasons
                      why the identical proposal was withdrawn as
                      overbroad…………………………………………35

             4.     The IRS failed to meaningfully consider
                      comments in the Administrative Record about
                      capital flight and its impact…………………... ..40

             5.     The IRS also did not disclose critical factual
                      material for public review in the rulemaking…..47

         B.     The 2012 Amendment was also promulgated in
                violation of the RFA………………………………..49

             1.     Requirements of the RFA………………………49

             2.     The NPRM used erroneous information in
                      certifying that the RFA was inapplicable……….51

CONCLUSION………………………………………………………55

## TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*American Equity Inv. Ins. Co. v. SEC,*
    613 F.3d 166 (D.C. Cir. 2010)……………………………………33

*Am. Radio Relay League, Inc. v. FCC,*
    524 F.3d 227 (D.C. Cir. 2008)……………………………….........48

*American Tel. & Tel. Co. v. FCC,*
    974 F.2d 1351 (D.C. Cir. 1992)………………………………….29

*Ass'n of Data Processing v. Bd. of Governors*,
    745 F.2d 677 (D.C. Cir. 1984)…………………………………..29

*AT&T Corp. v. FCC,*
    220 F.3d 607 (D.C. Cir. 2000)…………………………………..30

\*   *Bus. Roundtable v. SEC,*
    647 F.3d 1144 (D.C. Cir. 2011)………………………………… 28

\*   *Chamber of Commerce v. SEC*,
    443 F.3d 899 (D.C. Cir. 2006)………………………………… 47

*FCC v. Fox Tel. Stations, Inc*.,
    129 S. Ct. 1800 (2009)…………………………………………35

*Kisser v. Cisneros*,
    14 F.3d 615 (D.C. Cir. 1994)…………………………………..30

\*   *Lilliputian Systems, Inc. v. Pipeline and Hazardous Materials*
    *Safety Administration,*
    741 F.3d 1309 (D.C. Cir. 2014)…………………………….41, 46

\*   *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile*
    *Ins. Co.,*
    463 U.S. 29 (1983)…………………………………………....28, 29

*National Organization for Marriage v. IRS,*
    Case No. 13-cv-01225 (E.D.V.A.  2014)……………………………24

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutr. Serv.,*
    416 F. Supp.2d 92, 108 (D.D.C. 2006)………………………… …55

\* *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carriers*
*Safety Admin., et al.*
    494 F.3d 188 (D.C. Cir. 2007)……………………………………48

*Petroleum Communications, Inc. v. FCC,*
    22 F.3d 1164 (D.C. Cir. 1994)……………………………………29

*Sierra Club v. EPA,*
    292 F.3d 895 (D.C. Cir. 2002)……………………………………28

*Solite Corp. v. EPA,*
    952 F.2d 473 (D.C. Cir. 1991)……………………………………47

*Troy Corp. v. Browner,*
    120 F.3d 277 (D.C. Cir. 1997)……………………………………28

*United Cellular Corp. v. FCC,*
    254 F.3d 78 (D.C. Cir. 2001)……………………………………55

*U.S. v. Miller,*
    425 U.S. 435 (1976)……………………………….....................33

*U.S. v. Nova Scotia Food Prods. Corp.,*
    568 F.2d 240 (2d Cir. 1977)…………………………………...48

\* *Williams Gas Processing v. FERC,*
    475 F.3d 319 (D.C. Cir. 2006)………………………………49, 50

## **Statutes**

5 U.S.C. § 553(c)……………………………………………………50

5 U.S.C. § 603……………………………………………………..49, 50

5 U.S.C. §604…………………………………………………………50

5 U.S.C. § 605(b)……………………………………………………30, 50

\* 5 U.S.C. § 611……………………………………………………………51

\* 5 U.S.C. § 706……………………………………………………………1

5 U.S.C. §706(2)(A)……………………………………………………32

12 U.S.C. § 3405…………………………………………………………33

26 U.S.C. § 871(i)(2)(A)……………………………………………7, 12

26 U.S.C. § 1471………………………………………………………20

26 U.S.C. § 7602(a)(1)…………………………………………………34

28 U.S.C. § 1331………………………………………………….....1

28 U.S.C. §1291………………………………………………………2

28 U.S.C. § 1391………………………………………………………1

**Regulations**

\* 26 C.F.R. § 1.6049-4(b)(5)………………………………………1

\* 26 C.F.R. § 1.6049-8………………………………………….....1

26 C.F.R. § 31.3406(a)-2……………………………………………1

31 C.F.R. § 103.12 (b)(i)(A)………………………………….. 33

**Other Authorities**

58 Fed. Reg. 51735 (Executive Order 12866) (Oct. 4, 1993)……………43

53 Fed. Reg. 5991 (Feb. 29, 1998)……………………………….……14

61 Fed. Reg. 17572 (Apr. 22, 1996)……………………………..……6, 7, 14

66 Fed. Reg. 3925 (Jan. 17, 2001)……………………………………15

66 Fed. Reg. 15820 (Mar. 21, 2001)…………………………………15

66 Fed. Reg. 16019 (Mar. 22, 2001)……………………………….……15

67 Fed. Reg. 50836 (Aug. 2, 2002)……………………….……………15, 35

*    76 Fed. Reg. 1105 (Jan. 7, 2011)…………………….…6, 16, 20, 30, 36, 43, 52

76 Fed. Reg. 3821 (Executive Order 13563)(Jan. 21, 2011)………………42

*    77 Fed. Reg. 23392 (Apr. 19, 2012)………………………..1, 6, 16, 20, 43

Federal Reserve Bank of Chicago, MODERN MONEY MECHANICS: A WORKBOOK ON BANK RESERVES AND DEPOSIT EXPANSION (Rev. Ed. 1992)……………………………………………………42

Elliott L. Richardson, *United States Policy Toward Foreign Investment: We Can't Have It Both Ways*, 4 AM. UNIV. L. REV. 281 (1989)….………12

Patrick J. Smith, *District Court Misapplies APA in Florida Bankers Association,* TAX NOTES 747 (Feb. 17, 2014)…………………..………46

# GLOSSARY

| | |
|---|---|
| APA | Administrative Procedure Act |
| FBA | Florida Bankers Association |
| FATCA | Foreign Account Tax Compliance Act |
| IRS | Internal Revenue Service |
| NPRM | Notice of Proposed Rulemaking |
| NRA | Non-resident Alien |
| RFA | Regulatory Flexibility Act |
| TBA | Texas Bankers Association |

# JURISDICTIONAL STATEMENT

On April 12, 2012, the U.S. Department of the Treasury and Internal Revenue Service ("IRS") approved final regulations expanding the reporting requirement on interest earned by foreign individuals on deposits at the U.S. offices of financial institutions from one country, Canada, to an additional seventy nations ("2012 Amendment"), 26 C.F.R. §§ 1.6049-4(b)(5) and 1.6049-8; 77 Fed. Reg. 23394 (April 19, 2012) (App. 216).

For tax years beginning January 1, 2013, U.S. depository institutions[1] must report this personal financial information annually to the IRS so that the IRS can "exchange information relating to tax enforcement with other jurisdictions." *Id*. These other jurisdictions include China, Egypt, Indonesia, Mexico, Pakistan, Panama, the Russian Federation, Ukraine and Venezuela.

Appellants' causes of action contesting the validity of the agency action arose under the Administrative Procedure Act ("APA"), 5 U.S.C. §§701-706*,* and the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612. The District Court had subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1331 and venue pursuant to 28 U.S.C. §1391.

---

[1] In addition to banks and savings institutions, other financial institutions covered under the regulation include credit unions, securities and brokerage firms, and insurance companies. 26 CFR §31.3406(a)-2.

The District Court denied Appellants' Motion for Summary Judgment and entered Judgment in favor of the Appellees with an accompanying opinion on January 13, 2014 ("Opinion") (App. 7).  Appellants filed a timely notice of appeal on February 5, 2014.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     Whether the 2012 Amendment was consistent with the APA's requirements that regulations adopted by administrative agencies be premised on substantial evidence and warranted by the factual record and that changes in policies be accompanied by a reasonable explanation.

2.     Whether the Appellees acted arbitrarily and capriciously in positing that the 2012 Amendment was "not a significant regulatory action" even though it affected an estimated $400 billion in U.S. bank deposits and placed, by the Appellees' own calculations, $26 billion of those funds at risk of "capital flight," *i.e.* withdrawal from United States banks.

3.     Whether the Appellees acted arbitrarily and capriciously in concluding that the 2012 Amendment "would not significantly impact the investment and savings decisions of the vast majority of nonresidents."

4.     Whether the Appellees complied with the APA's requirements that agencies' final rulemakings provide evidence that attention was paid to comments submitted by the public during the rulemaking process.

5.     Whether the Appellees conducted a proper and adequate analysis of the economic impact of the 2012 Amendment on small entities, as required by the RFA, while proceeding on the clearly inaccurate basis that

there were 94,192 commercial banks and 16,098 savings institutions doing

business in the United States – a miscalculation of over 1,000 percent.

## STATUTORY AND REGULATORY PROVISIONS INVOLVED

Applicable statutes and regulatory provisions appear in the

Addendum.

## CONCISE STATEMENT OF THE CASE

This is an atypical APA case in two significant aspects. First, it does not represent simply a challenge to a new regulation but rather to the massive expansion of an existing rule initially promulgated in 1996. That rule had required U.S. banks and certain other depository institutions to file annual information returns with the IRS on interest earned on non-resident alien ("NRA") accounts held by Canadian citizens for the purpose of allowing reciprocal exchange of such information with the Canadian tax authorities. 61 Fed. Reg. 17572 (Apr. 22, 1996) (App. 235).

After an attempted and later abandoned effort in 2001 to expand the list of reporting and exchanging countries, the Treasury Department and IRS resurrected the initiative in 2011. (76 Fed. Reg. 1106 (Jan. 7, 2011)) ("2011 Proposal") (App. 221). One year later, in 2012, Appellees finalized the new regulation extending the information reporting requirement to NRA accounts held by foreign individuals to the approximately 70 countries with which the United States has a tax treaty. 77 Fed. Reg. 23394 (April 19, 2012) (App. 216). It is the 2012 Amendment which Appellants challenge. Appellants contend that the Administrative Record lacked any demonstrated tax compliance benefits under the Canadian model, let alone any rational basis

6

for the exchange of personal financial data with countries bearing little resemblance to Canada's political stability and public safety record.

By way of background, interest paid to nonresident aliens on U.S. bank deposits is not subject to federal taxation in the United States.  26 U.S.C. § 871(i)(2)(A).  The prior Canadian regulation and the 2012 Amendment purportedly share the same stated purpose, to "ensure that the IRS is in a position to exchange such information reciprocally with a treaty partner" (61 Fed. Reg. 17573 (Apr. 22, 1996) (App. 235); 77 Fed. Reg. 23391 (Apr. 19, 2012)) (App. 216), and thereby prevent U.S. taxpayers from avoiding U.S. taxes by placing assets in other countries.  *Id*.

The Administrative Record underlying the new Rule, however, contains no evidence that a single dollar in additional U.S. tax revenues has ever been collected during the 15 years in which the collection and purported exchange system has been in place with Canada.  In fact, the Administrative Record does not even indicate that the two governments have ever, or how often, actually exchanged this type of tax information held by the other.

The Administrative Record does reveal, on the other hand, that the initiation of the Canadian NRA reporting requirements caused a 25 percent decline in the number of U.S. bank accounts held by Canadian citizens.

(App. 416). The Administrative Record also includes the Treasury Department and IRS' analytical prediction that the loss equivalency of the Canadian NRA deposit outflow, as applied to the additional countries set forth in the 2011 Proposal covered by the 2012 Amendment, could result in a potential $26 billion outflow of capital from the estimated $400 billion of NRA deposits held in the United States. (App. 417).

Notwithstanding the empirical evidence and widespread opposition to the proposal communicated by affected institutions in the financial industry, the Congress, and the general public, the IRS maintained that neither the 2011 Proposal nor the 2012 Amendment was a "significant regulatory action." As a consequence of the unsupported premise that placing a significant amount of the estimated $400 billion of U.S. bank deposits at risk of capital flight was "insignificant," no regulatory assessment of costs versus benefits of the 2012 Amendment was performed under either the APA or the RFA.

The second aspect in which this case differs from standard APA review cases is that the interim between finalization of the 2012 Amendment (April, 2012) and the filing of this litigation allowed Appellants to survey member institutions on the early but actual impact the promulgation of the 2012 Amendment as to the critical question of NRA capital flight.

8

Appellants submitted affidavits below which fully supported commenters' admonitions that depositors' awareness that the United States would be sharing individual bank account information with a broad array of foreign governments would result in a significant withdrawal of NRA deposits from U.S. banks. As Appellants had predicted this outflow also had an adverse effect on these institutions' lending capacity.[2]

The District Court granted the Appellees Cross-Motion for Summary Judgment because it concluded that the IRS' decisions were "rational and supported by the evidence." *Florida Bankers Association, et al. v. United States Department of Treasury, et al.*, No. 13-529, 2014 U.S. Dist. LEXIS 3521, at *23-*26 (D.D.C. January 13, 2014). With regard to the substantial and admitted deposit outflow occurring coincident with the imposition of the Canadian NRA reporting requirement, the District Court stated that "no evidence on the record shows that the Canadian reporting regulations caused the so-called capital flight." *Florida Bankers Association,* 2014 U.S. Dist. LEXIS 3521, at *32 (emphasis in original). This reasoning turns the APA on its head in that it rejects Appellants' *prima* facie showing of causation, and places the burden on the regulated entities to, in effect, come up with a

---

[2]    Appellants' members reported NRA outflows of between about $3 million at smaller institutions to as high as $70 million at mid-size banks. *See generally Pls.' Mot. for S.J.,* Exs. A- B, Oct. 10, 2014 (App. 134).

further explanation, even though the government failed to show a rational alternative explanation for the Canadian deposit outflow.

As a result, the 2012 Amendment was not adopted in a manner consistent with the APA's requirements that agency action be based on a rational connection between the administrative record and the final regulation and that agencies also signify in rulemaking that they have considered substantive comments from the public.

There was further clear error with respect to the application of the RFA to the 2012 Amendment in that the Treasury Department and IRS proceeded on the premise that the universe of affected institutions consisted of 94,192 banks and 16,098 savings institutions. Actually, there were only 6,290 commercial banks and 1,067 savings institutions operating in the United States at the time of this rulemaking. That the U.S. Treasury Department, which regulates banks representing approximately 70 percent of the total banking assets in the United States would finalize a major banking regulation on such an extensive miscount of the actual number of banking institutions in the country is indicative, in and of itself, that this was an arbitrary and capricious agency action. Utilizing a far smaller universe of regulated entities necessarily leads to a corresponding significantly

erroneous underestimation of the impact of the deposit outflow on affected

depository institutions.

## STATEMENT OF FACTS

### A.     Policy background

As a matter of long-standing U.S. tax policy, interest paid to nonresident aliens on U.S. bank deposits is not subject to federal taxation. 26 U.S.C. § 871(i)(2)(A).   This reflects the broader public policy favoring the free flow of capital as a benefit to the United States, which was well-summarized below by former Secretary of Commerce Elliot Richardson:

> The United States policy toward foreign investment is rooted in the national self-interest of the United States.  This country has maintained an open door policy for foreign investment not as an accommodation to foreigners or their governments, but rather because of the benefits foreign investment provides to the United States economy.  The United States has viewed foreign investment as a means of growth, a way of introducing new technologies and management skills, expanding employment, and increasing productivity.[3]

Foreign investment in the United States can take many forms, including direct investment in real property or the stock of U.S. companies, but the far larger category consists of private portfolio holdings of U.S. assets by foreigners. This includes public and private securities, deposits

---

[3]   Elliot L. Richardson, "United States Policy Toward Foreign Investment: We Can't Have It Both Ways," 4 AM. UNIV. INTL. L. REV. 281, 290 (1989).

with banks in the United States, and similar investments.  The largest area of foreign portfolio investment is in U.S. banking institutions.[4]

### B.    Amount of deposits

While the Treasury Department collects monthly data on bank deposits held by foreigners (entitled "U.S. Financial Firms' Liabilities to Foreign Residents"), it presents aggregated information consisting of foreign governments, foreign banks, and other corporations' deposits, not just individual bank depositors.  The 2012 Amendment applies only to foreign individuals with interest-bearing deposits, however.  While the IRS has continuously insisted that the 2012 Amendment was not a "significant regulatory action," it is noteworthy that during the entire rulemaking process the IRS never disclosed any estimate of the amount of NRA bank deposits covered by the proposed regulation.  Appellants' Complaint specified the amount at $400 billion (¶ 11) (App. 7), and all parties now concur that the $400 billion figure is an accurate estimate.  *Florida Bankers Association*, 2014 U.S. Dist. LEXIS 3521, at *15.

---

[4]  *Id*. at 287, citing data from the U.S. Dept. of Commerce "Monthly Survey of Current Business*."*

### C.     Chronology of the rule

Against the aforementioned background of a strong public policy favoring foreign investment in the U.S. and the achieved result of attracting hundreds of billions in bank deposits from foreign individuals or investment in the U.S. economy, the IRS commenced the process of initiating a reporting system for these non-taxable accounts in 1988. 53 Fed. Reg. 5991 (Feb. 29, 1988) (App. 239).

The IRS's proposal was directed specifically to U.S. deposits from residents of Canada.  The IRS claimed that the deposit account information "would be of significant use in furthering its compliance efforts." *Id*.  It was further asserted that the proposal was not a "major rule" as defined by Executive Order 12291, not to be subject to the APA and not to be covered by the RFA. *Id.*

The 1988 proposed regulation was opposed by commentators on the ground that it would undercut the competitiveness of U.S. banks.  It remained dormant for eight years, but was nonetheless finalized in 1996.  61 Fed. Reg. 17572 (April 22, 1996) (App. 235).

There matters stood for another five years until Treasury/IRS published a new notice of proposed rulemaking to expand the information reporting and international sharing of deposit interest information applicable

not just to nonresident alien Canadians but to residents of any country. 66

Fed. Reg. 3925 (Jan. 17, 2001) (App. 231), corrected at 66 Fed. Reg. 15820

(Mar. 21, 2001) (App. 230) and 66 Fed. Reg. 16019 (Mar., 22, 2001) (App.

229) (the 2001 Proposal).   Even though the 2001 Proposal facially applied

to every foreign country, it, too, contained the following recitation:

> It has been determined that this notice of proposed
> rulemaking is not a significant regulatory action as defined
> in Executive Order 12866. Therefore, a regulatory
> assessment is not required. It has also been determined that
> section 553(b) of the Administrative Procedure Act (5
> U.S.C. chapter 5) does not apply to these regulations, and,
> because the regulations do not impose a collection of
> information on small entities, the Regulatory Flexibility Act
> (5 U.S.C. chapter 6) does not apply. Guidance on Reporting
> of Deposit Interest Paid to Nonresident Aliens, 66 Fed. Reg.
> at 3927.

Due to strong opposition from the financial industry, Congress, and

other public commentators, the 2001 Proposal was withdrawn and re-

proposed in August 2002 as a more narrow regulation applicable to just 13

European countries, Australia and New Zealand. 67 Fed. Reg. 50386 (Aug.

2, 2002) (App. 225). At that time, the Treasury Department and IRS

admitted that the 2001 Proposal had been "overly broad." *Id*. at 50387.

Even as scaled back, the 2001 Proposal remained highly controversial

and was never finalized. No further governmental action in this area ensued

for another nine years until a Notice of Proposed Rulemaking was published

in 2011.  The 2011 Proposal was once again applied to all foreign countries

with the IRS maintaining its previous position, namely that:

> It has been determined that this notice of proposed
> rulemaking is not a significant regulatory action as defined
> in Executive Order 12866.    Therefore a regulatory
> assessment is not required. It has also been determined that
> section 553(b) of the Administrative Procedure Act (5
> U.S.C. chapter 5) does not apply to this regulation. 76 Fed.
> Reg. 1106 (Jan. 7, 2011).

The NRA reporting requirement's resurrection was now explained as

supposedly being "appropriate" in light of "a growing global consensus

regarding the importance of cooperative information exchange for tax

purposes," the need to "strengthen the United States exchange of

information program," and a professed desire to help improve voluntary

compliance by U.S. taxpayers by "making it more difficult to avoid the U.S.

information reporting system (such as false claims of foreign status)." *Id*.

While using somewhat different terminology, the 2011 rationale was

essentially the same as first used in 1988, namely, to improve U.S. tax

compliance through information sharing with other countries.

### D.    Post-NPRM developments

1.    <u>The written comments overwhelmingly opposed the 2011
Proposal.</u>

Unsurprisingly, the third IRS attempt within a 25-year period to

expand information gathering on non-taxable bank deposits produced a

significant public response.  In, November, 2009, the IRS Office of Chief Counsel issued a memorandum to other IRS staff entitled "Proposed Regulation—Guidance on Reporting Interest Paid to Nonresident Aliens REG-146097-09." (App. 415).  This document stated "this guidance can be expected to be extremely controversial." *Id.* (emphasis added). Nevertheless, a concurrent IRS document specifying a Planned Publication Date of December 31, 2009 for a Notice of Proposed Rule Making regarding REG-146097-09 still termed the Proposed Regulation "Not Significant." (App. 414).

Ninety out of the 93 comment letters submitted in response to the NPRM opposed adoption of the Proposed Amendment.   (App. 334). Significantly, none of the three commenters supporting the Amendment fell within the category of an affected party.[5]

Typical of the comments in opposition are the following from the Commissioner of the State of Florida Office of Financial Regulation:

---

[5]   <u>See</u> Comment, Hon. Carl Levin (Jan. 11, 2012)  (App.  274);  Comment, Tyler Winkleman, Esq. (Apr. 7, 2011) (App. 306); Comment, Rebecca Wilkins, (May 18, 2011) (App. 402).

> There is nothing in the Background and Explanation of Provisions in the published notice that gives any indication of the extent to which the rule will be of any benefit to the United States.
>
> The asserted interests of the United States taxing authorities can be achieved by methods other than the blanket collection of the entire universe of non-resident alien deposit information with the authority to make it available to other governments. The United States has tax treaties with many countries. These treaties could provide for the reciprocal exchange of information on an appropriate case by case basis.
>
> The rule does impose substantial regulatory burdens on financial institutions and particularly on those which are small businesses.[6]

2.     <u>The testimony at the public hearing opposed the 2011 Proposal.</u>

The testimony elicited at a public hearing held on the NPRM in May, 2011 was likewise highly critical of the plan.  At the hearing, for example, the American Bankers Association testified that community and regional banks in Florida "stand to lose billions of dollars in foreign investments." Testimony of Francesca N. Mordi, Vice President & Tax Counsel of the ABA at the May 18, 2011, IRS Hearing on REG-146097-09 (Reporting Interest paid to Nonresident Aliens) (App. 374).

---

[6]   Hearing Statement, J. Thomas Cardwell, Former Commissioner, Florida Office of Financial Regulation, before the House Committee on Financial Services, 112th Congress, 2nd Sess. (Oct. 27, 2011) (App. 349).

The decision below rather blithely asserted that "these regulations would not deter any rational actor other than a tax fraud from using U.S. banks," *Florida Bankers Association*, 2014 U.S. Dist. LEXIS 3521, at *16. But an executive representing the Florida International Bankers Association at the aforementioned IRS public hearing explained the practical derivation of these accounts as stemming from quite different, understandable and pragmatic considerations:

> NRAs keep their deposits in United States for safety, personal and political reasons. There are numerous examples of political and financial instability in South and Central America countries over the years, and having their deposits in the U.S. is a means for our customers to hedge against these uncertainties. In numerous instances and in various countries, our customer deposits in the region have been nationalized, subjected to exchange controls with little or no warning, involuntarily converted into other currencies at unreasonable exchange rates, or even confiscated by their local governments.  Testimony of Maria Vega, Board Member of the Florida International Bankers Association at the May 18, 2011, IRS Hearing on REG-146097-09 (Reporting Interest paid to Nonresident Aliens) (App. 363).

In the plainest possible language, the President of the Florida Bankers Association explained the "real world" situation as follows:

19

> NRA depositors are concerned that the IRS reporting to the equivalent department in their home countries and someone will squeal to the kidnappers that these folks have monies in the United States. Testimony of Alex Sanchez at the May 18, 2011, IRS Hearing on REG-146097-09 (Reporting Interest paid to Nonresident Aliens) (App. 366).

On the question of the potential economic impact of the Proposed Amendment, Mr. Sanchez also observed that "especially in the southern part of our state where substantial NRA deposits are held, the percentages in some of our banks is up to 40 to 50 percent." *Id.* This latter point was intended to explain the impact on smaller entities, since there was no breakdown in the Administrative Record as to the amount of NRA deposits by region, state, size, location, or any other categorization.

3.    The IRS's erroneous claims to congressional support for the 2011 Proposal.

The preamble to the Federal Register notice finalizing the 2012 Amendment references purported congressional support for the plan in the form of the enactment in March, 2010 of the Foreign Account Tax Compliance Act ("FATCA") (Pub. L. 11-147, codified at 26 U.S.C. §§ 1471 *et seq.*), 76 Fed. Reg. 23392 (April 19, 2012).  But the NPRM for the 2012 Amendment made no mention whatsoever of FATCA, even though the statute had been on the books for almost a year.  76 Fed. Reg. 1105 (Jan. 7, 2011) (App. 221).

20

The IRS's late conversion aside, however, the NPRM's publication in 2011, after nearly a 10-year hiatus on the issue, did not evoke support but rather sparked significant and bipartisan Congressional opposition to the plan.

On March 2, 2011, all 25 Members of the Florida U.S. House congressional delegation wrote a letter to the President of the United States objecting to the 2011 Proposal on the grounds that it would: (1) cause serious harm to the U.S. economy; (2) flagrantly violate the intent of Congress; and (3) cause U.S. banks to lose billions of dollars in deposits. The letter also addressed the basis for the high volume of the accounts in the United States:

> Many nonresident alien depositors are from countries with unstable governments or political environments, where personal security is a major concern. They are concerned that their personal bank account information could be leaked by unauthorized persons in their home country governments to criminal or terrorist groups upon receipt from U.S. authorities, which could result in kidnappings or other terrorist actions being taken against them and their family members in their home countries, a scary scenario that is very real. *See* Florida Congressional Delegation Letter to the President (March 2, 2011) (App. 407).

On October 27, 2011, the House Subcommittee on Financial Services and Consumer Credit held a hearing on the 2011 Proposal where bipartisan objection was voiced by members of the Subcommittee and ten of the eleven

witnesses testifying or submitting statements for the record warned against the adverse consequences of the proposal. *See generally* Hearing before the House Committee on Financial Services, 112th Congress, 2nd Sess. (October 27, 2011). Among these was a letter from the Commissioner of the Texas Department of Banking, which is responsible for supervising over 300 banks with 165 billion in assets. The Banking Commissioner warned about the effect of this proposed rule on smaller entities:

> Secondly, this proposal has not been properly vetted. The Notice of Proposed Rulemaking (NPR) states that the rule will not have a significant impact on a substantial number of small entities because "(t)he depository accounts … tend to be with larger financial institutions operating in the United States and therefore the number of small entities that will be required to undertake this collection information is expected to be limited." By presuming that the only impact of the proposal would be the increased regulatory burden of collecting and reporting the information, the NPR fails to address a significant concern: the potential financial impact the withdrawal of such deposits would have on community banks with large non-resident alien populations. Letter from Charles G. Cooper, Commissioner, Texas Department of Banking, to House Financial Service Subcommittee on Financial Institutions (October 27, 2011) (App. 347).

As we shall explain, these comments and warnings were, for all intents and purposes, brushed aside.

4. <u>The IRS's changes to the 2011 Proposal were insignificant</u>.

The IRS claims to have made two meaningful changes in response to the pointed criticism generated by 2011 Proposal. The first of these was a

specification that the information reported pursuant to these regulations would be exchanged only with foreign governments with which the U.S. has an exchange agreement. *Id*. at 23292. This is not a substantive change from the 2011 Proposal for it would be impossible for the routine exchange of information to occur without a bilateral information-sharing agreement.

The second change was the purported assurance that "the IRS will not exchange information on deposit interest or otherwise with a country if the IRS determines that the country is not complying with its obligations under the agreement to protect the confidentiality of information and to use the information solely for collecting and enforcing taxes covered by the agreement." *Id*. However, the 2012 Amendment contains no description of this screening process, what criteria would be used, whether or not affected parties could participate and what avenue of appeal, if any, would be allowed.

Most importantly, it is an illusion to believe that the IRS has the ability to adequately ascertain whether countries such as China, Egypt, Mexico, Russia and Venezuela are protecting or have the ability to protect the confidentiality of the information, let alone use it "solely for collecting and enforcing taxes," as claimed in the final rule.

23

Since the publication of the 2011 Proposal, the following news events have occurred with respect to countries with which the U.S. has tax treaties:

- *Canadian Tax Agency Hacked Using Heartbleed*, PC Magazine (Apr. 15, 2014).
  http://www.pcmag.com/article2/0,2817,2456583,00.asp.

- *Egypt: At Least 846 Killed In Protests,* Associated Press (April 19, 2011).
  http://usatoday30.usatoday.com/news/world/2011-04-19-egypt-protests-death-toll.htm

- *Kidnappings Soar in Mexico, With Police Often The Perpetrators,* McClathcy (Oct. 31, 2013).
  http://www.mcclatchydc.com/2013/10/31/207103/kidnappings-soar-in-mexico-with.html.

- *Russia: Crackdown on Government Critics,* Human Rights Watch (Jan. 21, 2014)
  http://www.hrw.org/news/2014/01/21/russia-crackdown-government-critics

- *U.N. Voices Concern Over Reports of Excessive Force in Venezuela,* New York Times (Apr. 27, 2014)
  http://www.nytimes.com/2014/03/07/world/americas/un-voices-concern-over-reports-of-excessive-force-in-venezuela.html

International incidents aside, just last month, the IRS entered a Consent Judgment and monetary payment with regard to one of its own employees improperly disclosing confidential tax information. *National Organization for Marriage v. IRS,* Case No. 13-cv-01225 (E.D.VA. June 23, 2014).

All of these points are offered for the purpose of noting that the IRS's professions of great faith in its ability to control, or even patrol, for breaches of bank depositors' expectations of confidentiality are of dubious merit.

## SUMMARY OF ARGUMENT

At the core of this case is the dismissal by the Treasury Department and the IRS's waving aside of the objections by Appellants and virtually all other commenters that the 2012 Amendment would result in substantial flight of investment capital from United States banks. This position is stated in the preamble to the final Rule as follows:

> The Treasury Department and the IRS believe that the legal and administrative safeguards described in the preceding paragraphs regarding the use of information collected under these regulations should adequately address the concerns identified by the comments and, therefore, these regulations should not significantly impact the investment and savings decisions of the vast majority of nonresidents who are aware of and understand these safeguards and existing law and practice. (77 Fed. Reg. 23393 (April 19, 2012)) (App. 216).

1. According to this explanation, the IRS concluded that nonresident, noncitizens of the United States would be sufficiently "aware of and understand" that U.S. tax treaty obligations would be sufficient to adequately keep their home governments (China, Russia, Pakistan,

Venezuela, etc.) from any unauthorized distribution or utilization of this information for purposes other than domestic tax-related compliance.

Adopting the position that this form of IRS oversight of foreign governments will assuage concerns on the part of the "vast majority" of NRA depositors is a theoretical assumption apparently formulated outside of the underlying Administrative Record. Moreover, it is directly contrary to that part of the Administrative Record demonstrating, on the basis of the IRS's own data, that the initiation of Canadian reporting requirement resulted in a 25 percent decline in the number of U.S. bank accounts held by Canadian citizens. Treasury International Capital Data, Canadian Depositors, Department of Treasury. (App. 416).

2. As noted, the Administrative Record also includes a study demonstrating that the loss equivalency of the Canadian NRA deposit outflow, as applied to the additional countries set forth in the 2011 Proposal, could result in a potential $26 billion capital outflow from the United States. Nonetheless, Appellees submit that the 2012 Amendment, which affects deposit balances in the amount of $400 billion, is anything but "not a significant regulatory action."

3. The Administrative Record further contains no evidence that 15 years of experience under the information reporting and exchange program

with Canada has produced any additional collection of tax revenue for the United States.  It is thus theoretical and, again, without any basis in the Administrative Record for the IRS to have concluded that the expansion of the existing system to an additional 70 countries would improve the voluntary compliance of U.S. taxpayers, as also claimed in the preamble to the 2012 Amendment.  *Id*. at 23392.

4.  It is also significant that in approving the 2012 Amendment, the IRS offered no explanation as to why the current system of collecting information under federal laws applicable when establishing any bank account, and which information is readily available through subpoena or summons to the IRS, is inadequate for tax enforcement and international exchange via tax treaties.

5.  Further, Appellants maintain that the IRS erred in deciding that the impact of the 2012 Amendment "will not be significant" on small entities as defined by the RFA, *Id*., 23394.  There was clear error in establishing the analytical framework for the RFA analysis as it proceeded on the assumption that there were 110,000 FDIC-insured depository institutions holding the $400 billion when in fact there were only 7357 such institutions.  Equally important, the Administrative Record contained no distribution of NRA account balances by size of bank or any other relevant category.  With such

27

shortfalls in its methodology, one can gain no comfort in the IRS's determination that smaller entities would not be impacted severely.

## STANDING

Appellants are membership business associations all of whose voting members are FDIC-insured banks or savings institutions subject to the 2012 Amendment and to the reporting requirements if they hold NRA accounts. As such, the association holds standing rights on a pass-through basis. *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Neither the claim presented nor the relief requested requires the participation of an individual member.

## ARGUMENT

### I.     Standard of Review

When reviewing the decisions of the District Court, as here, this Court's review of the administrative record and the agency's decision is *de novo. See Troy Corp. v. Browner*, 120 F.3d 277, 281 (D.C. Cir. 1997).

### II.     Argument and authority

From the APA standpoint, the 2012 Amendment must reflect "reasoned decision making," *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983), as well as a response to "substantial problems raised by commenters." *Bus. Roundtable*

28

*v. SEC*, 647 F.3d 1144, 1149 (D.C. Cir. 2011). Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, the court must undo its action. *Petroleum Communications, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994), citing *American Tel. & Tel. Co. v. FCC*, 974 F.2d 1351, 1354 (D.C. Cir. 1992).

Agency action is to be deemed arbitrary and capricious under the APA (5 U.S.C. § 706(2)(A)) if the agency has "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise," *Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43. The same result holds true where an agency reverses course or policy without a reasoned explanation. *Williams Gas Processing v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006).

In addition to requiring a reasoned basis for agency action, the "arbitrary or capricious" standard requires an agency's action to be supported by the facts in the record. *Ass'n of Data Processing v. Bd. of Governors*, 745 F.2d 677, 684 (D.C. Cir. 1984). In other words, the Court must reverse an agency's decision when a rule "is not supported by substantial evidence, or the agency has made a clear error in judgment."

*AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000), citing *Kisser v. Cisneros*, 14 F.3d 615, 619 (D.C. Cir. 1994).

Under the RFA, a Regulatory Flexibility Analysis must also be performed in a rulemaking proceeding unless the agency has provided a factual basis that the proposed or final rule will not have a "significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b).  Appellees' decision not to create one here was error.

## A.     The 2012 Amendment lacked reasoned decision making

### 1.     <u>The IRS ignored its own evidence on capital flight.</u>

Appellees relied upon the Canadian experience as a basis for expanding the interest reporting requirements to another 70 countries, describing the situation in the following bland terms: "This rule would *simply* extend the reporting requirement to all nonresident aliens." 76 Fed. Reg. 1107 (Jan. 7, 2011) (emphasis added) (App. 221).  But neither the NPRM nor any other aspect of the Administrative Record contains any evidence that 15 years of information-gathering and the presumed reciprocal sharing with Canadian authorities had benefited U.S. tax compliance.  This would appear to have been an elementary starting point before expanding the program 70-fold.

On the other hand, the Administrative Record does demonstrate, per the IRS's own data, that the initiation of the Canadian reporting requirements had been followed by an approximate 25 percent decline in the number of bank accounts held in the United States by nonresident Canadian citizens:

Form 1042s Data on Reported Deposit Interest
Received by Canadian Individual Recipients of Exempt Interest

| Year | Number of Accounts (000's) |
|------|----------------------------|
| 2001 | 78.0 |
| 2002 | 66.1 |
| 2003 | 47.7 |
| 2004 | 51.1 |
| 2005 | 53.7 |
| 2006 | 58.5 |
| 2007 | 55.0 |
| 2008 | 59.1 |

Tabulations of IRS Form 1042s Data, Department of Treasury (2008)(App. 416).

The court must assure itself the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choices made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Not only did the underlying agency action here lack a causal link, it was undertaken in direct contradiction to the

31

IRS's own information about the Canadian experience, the uniform objection of almost all public commenters, and the subsequent results as exemplified by the Appellants' post-promulgation survey of Florida and Texas deposit flows.

There is likewise no rational connection between Canada and the new list of exchange countries containing, as it does, examples of porous, if not rogue, regimes as well as countries plagued by rampant criminal cartels.

These are not policy disagreements between an administrative agency and the affected industry, but mathematics and objective facts standing in the face of where the IRS has wanted to proceed for 25 years. Appellees' way of confronting these opposing facts was by offering an unsupported conclusion that the "vast majority of nonresidents who are aware of and understand these safeguards and existing law and practice" will not withdraw their deposits from the United States.

That claim does not withstand scrutiny. By ignoring their own data, Appellees violated the APA by acting in an arbitrary and capricious manner. 5 U.S.C. §706(2)(A).

    2.    <u>The IRS failed to consider and analyze existing procedures for collecting bank deposit information.</u>

It is a basic requirement of agency rulemaking that consideration be given to existing law and regulation in order to first determine if sufficient

procedures exist for accomplishing the stated public policy objectives. *American Equity Inv. Ins. Co. v. SEC*, 613 F.3d 166, 179 (D.C. Cir. 2010). In this rulemaking, however, the Administrative Record includes no discussion, let alone any comparative analysis, of the extensive and often-used procedures available under current law and regulations for the IRS (and other federal, state and governmental authorities) to obtain individual bank account data on individuals maintaining a bank account. 12 U.S.C. § 3405.

All the requisite information is required pursuant to the Customer Identification Program established under Section 326 of the U.S.A. PATRIOT Act   requiring all depositors to furnish their name, date of birth, address and current government-issued identification. 31 C.F.R. §103.12(b)(i)(A).   In addition to this due diligence, individual foreign depositors also must furnish physical and mailing addresses, and passports for purposes of complying with IRS Form W-8.   In the absence of this information, which must be periodically updated, NRA deposits are subject to U.S. withholding.

Since the 1976 decision in *U.S. v. Miller*, 425 U.S. 435 (1976), there has not been any dispute that bank depositors have no protectable Fourth Amendment interest in bank records relating to their accounts. That decision was made knowing that the IRS possessed broad discretionary authority to

33

issue an administrative summons to compel the production of any taxpayers' bank records. *See* 26 U.S.C. § 7602(a)(1). Nor is there any limitation once the individual deposit information is obtained by the IRS on it being shared with a U.S. tax treaty partner.

Thus, the reporting requirements set forth in the 2012 Amendment are redundant and unnecessary. The District Court inadequately addressed this existing law situation by observing that it "is obviously easier to receive information routinely than to issue a series of summonses whenever a tax treaty partner requests information." *Florida Bankers Association,* 2014 U.S. Dist. LEXIS 3521, at *17. But making a task easier on a particular government agency is not sufficient in and of itself to satisfy the APA (or the RFA), and certainly not on this record.

It was the responsibility of the Treasury Department and IRS to collect and properly consider information as to the extent and efficacy of existing procedures before concluding that a new and indeed near-universal collection system was required. Yet the Administrative Record is devoid in this regard. Nor was there any discussion or explanation as to whether alternative approaches less sweeping than the universal system now mandated would be satisfactory.

34

Having circumvented the requisite comparative considerations, Appellees had no basis to conclude that the additional direct and indirect costs imposed by the 2012 Amendment provided meaningful benefits over the *status quo* and thus failed to discharge their responsibilities under both the APA and the RFA.

3.    The IRS failed to adequately address the reasons why the identical proposal was withdrawn as overbroad

As published, the 2011 Proposal was identical to the 2001 Proposal in that it would have expanded the Canadian model of NRA reporting and sharing to residents of any country.  The Treasury and IRS withdrew that earlier proposal, noting that "[a]fter consideration of the comments received, the IRS and Treasury have concluded that the 2001 Proposal was *overly broad* in requiring annual information reporting with respect to U.S. bank deposit interest paid to any nonresident alien." 67 Fed. Reg. 50387 (Aug. 2, 2002) (emphasis added) (App. 225).

The APA requires there to be credible facts and a reasonable explanation for agency action, let alone when the action is taken in disregard of its own prior position. "To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position. An agency may not, for example, depart from a prior policy *sub silentio*…." *FCC v. Fox Tel.*

35

*Stations, Inc.*, 129 S. Ct. 1800, 1811 (2009).  Nor may an agency freely discard precedent, as well as policy, without offering a rational explanation in the record. *Williams Gas*, 475 F.3d at 326-330.

Here, something which the IRS found "overly broad" in 2002 was transformed a decade later into a rule that purportedly would "simply extend" the Canadian reporting requirement to all residents.  76 Fed. Reg. 1107 (Jan. 7, 2011) (App. 221).  No salient facts were provided in the Administrative Record to distinguish 2011 to 2002 or from 1996 or 1988 when the IRS first began promoting this plan. And indeed there are no such facts.

Instead of facts, the NPRM cites to glossy generalities, such as "a growing global consensus regarding the importance of cooperative information exchange for tax purposes that has been developed." *Id*. at 1106. Be that as it may, international developments do not alter the scope, costs and adverse impact within the United States of the sort of reporting requirements imposed by the 2012 Amendment.

If anything has grown during the period between these two proposals, as pointed out by numerous commenters, it has been an increase in the level of kidnappings, extortion and other crimes related to holders of financial assets.  *See generally*, App. 287; App. 289; App. 300; App. 301; App. 303;

36

App. 310; App. 312; App 317; and App. 332; *see also*, Guidance on Reporting Interest Paid to Nonresident Aliens, Summary of Comments (May 6, 2011) (App. 334).

The District Court, however, credited the same premise to explain away how the IRS could reasonably arrive at the opposite conclusion of its prior analysis, noting that the United States "has constructed an expansive network of international agreements, including income tax or other conventions and bilateral agreements relating to the exchange of tax information." *Florida Bankers Association,* 2014 U.S. Dist. LEXIS 3521, at *32-*33.  But in doing so the court below placed its imprimatur on a questionable *modus operandi*.  First the Treasury Department went out and created tax treaties with foreign countries providing for the reciprocal exchange of their citizens' personal financial data.  Then the IRS used these tax treaties as the purported change in circumstances which as if by magic supposedly justified the agency's adopting the same regulations which it had been attempting to impose and expand since 1988.

Though unmentioned in the 2011 Proposal, the preamble to the 2012 Amendment asserts to have uncovered a "new circumstance" in the form of the Congressional enactment of FATCA, which the Treasury Department and IRS now claim necessitates the 2012 information collection and

37

reporting requirements.   It is, to begin with, implausible to claim legislative

support in any form with respect to the 2012 Amendment given the extent of

Congressional opposition already described.

More importantly, a forthright description of FATCA would have

shown the reverse of Appellees' argument.   FATCA applies deposit

reporting requirements to foreign financial institutions, as compared to

foreign government treaty partners. The following is from an IRS

publication last updated June 27, 2014:

> "The provisions commonly known as the Foreign Account Tax
> Compliance Act (FATCA) became law in March 2010.
> - FATCA targets tax non-compliance by U.S. taxpayers with
>   foreign accounts
> - FATCA focuses on reporting:
>     - By U.S. taxpayers about certain foreign financial
>       accounts and offshore assets
>     - By foreign financial institutions about financial
>       accounts held by U.S. taxpayers or foreign entities in
>       which U.S. taxpayers hold a substantial ownership
>       interest
> - The objective of FATCA is the reporting of foreign financial
>   assets; withholding is the cost of not reporting."[7]

As plainly stated, FATCA requires foreign financial institutions to file

bank account information on U.S. taxpayers holding accounts at their

institutions for the express purpose of targeting non-compliance with U.S.

---

[7]   *See*   http://www.irs.gov/Businesses/Corporations/Foreign-Account-Tax-Compliance-Act-FATCA (last accessed July 15, 2014).

taxes.  This is precisely the information which the Treasury Department and IRS claim that the 2012 Amendment is designed to obtain, albeit in a circuitous, costly and disruptive route of obtaining comparable data first from U.S. banks and then exchanging that with individual foreign countries.

For the same reason, the District Court erred in uncritically accepteged Appellees' assertion that "if the United States does not gather and report tax information for foreign account holders, then other countries have little incentive to provide us with similar information.  *Florida Bankers Association*, 2014 U.S. Dist. LEXIS 3521, at *1, citing 77 Fed. Reg. 23391 (April 19, 2012) (App. 216).  For example, on August 29, 2013, the Justice Department announced that the United States and Switzerland entered an anti-tax evasion program whereby Swiss banks will provide the U.S. with individual account information to prosecute U.S. taxpayers who "hid behind Swiss bank secrecy laws or have undeclared offshore accounts in other foreign countries."[8]  This was apparently accomplished without the delivery of information to the Swiss government on nonresident Swiss citizens holding bank accounts in the United States.

---

[8]  Statement on the 2011 Offshore Voluntary Disclosure Initiative, Internal Revenue Service (Douglas Shulman, Commissioner) (Feb. 8, 2011) (App. 410).

Looking even further back in time, in 2009, UBS, Switzerland's largest bank, entered into a deferred-prosecution agreement involving the specific disclosure of the names of some 4,450 American clients suspected to be tax evaders to the IRS and Justice Department prosecutors.[9]  This production of U.S. taxpayer information was likewise accomplished without reciprocal exchange of Swiss citizen accounts held in U.S. banks.

It was arbitrary, capricious and an abuse of discretion for the Treasury and IRS to reverse their prior conclusion that extending the Canadian experience to a broad array of other countries would be "overly broad" in the absence of any factual record or other rational, empirically supported reasons apart from an unfounded and vaguely-described change in circumstances.

4.    The IRS failed to meaningfully consider comments in the Administrative Record about capital flight and its impact.

The APA provides that when an agency undertakes a rulemaking it "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).  By requiring the agency to articulate a rational connection between the facts it found and the decisions it made, the obvious implication

---

[9]  Statement on UBS/Voluntary Disclosure Program, Internal Revenue Service (Douglas Shulman, Commissioner)(Nov. 16, 2010) (App. 412).

is that the agency must consider and "adequately address" relevant concerns raised in the record. *Lilliputian Systems, Inc. v. Pipeline and Hazardous Materials Safety Administration*, 741 F.3d 1309, 1313 (D.C. Cir. 2014).

First of all, the IRS disregarded its own records suggesting that that the initiation of a reporting and sharing system with Canada had resulted in substantial capital flight.

Moreover, the IRS release adopting the rule failed to give any evident serious consideration to the unanimous written comments, oral testimony presented by banks, banking trade associations, several state bank regulators, and other experts in the field that the implementation of the 2011 Proposal (the precursor to the 2012 rule) would result in significant deposit outflows from Florida, Texas and other high impact areas as foreign customers would withdraw their funds.

Representative of this viewpoint was Zions Bancorporation, a large publicly held bank holding company. Its comment letter stated that "[w]e are convinced that this proposed change will drive existing nonresident alien customers to withdraw deposits from our banks. This loss of deposit income to our institutions will result in a decrease of funds available for lending…" (App. 317).

The Government also blinked reality in ignoring comments from other industry representatives about the severe consequences of capital outflow on smaller-sized lenders, as described above.  And it ignored another basic tenet of banking, one discussed by a former Florida Banking Commission: for every dollar in withdrawn deposits there is a multiple loss in bank lending ability.  This arises from the "Multiple of Deposit Creation" doctrine.  Under this principle, a bank that has $1,000,000.00 on deposit may lend out $900,000.00 of those funds, which are later re-deposited in the form of loans and investments of as much as nine times the amount of economic activity for every dollar deposited.   (App. 349) (written statement from former Commissioner of the State of Florida Office of Financial Regulation submitted to the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit (Oct. 27, 2011).  *See also* Federal Reserve Bank of Chicago, MODERN MONEY MECHANICS: A WORKBOOK ON BANK RESERVES AND DEPOSIT EXPANSION at 6 (Rev. Ed. 1992).

Instead of examining factual experience both the NPRM and the 2012 Amendment assert that "[i]t has been determined that these regulations are not a significant regulatory action as defined in Executive Order 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993) as supplemented by Executive Order 13563

76 Fed. Reg. 3821 (Jan. 21, 2011);  76 Fed. Reg. 1106 (Jan. 7, 2011); 77 Fed. Reg. 23391 (April 19, 2012).  On this basis, it was claimed that a regulatory flexibility assessment was not required.  The IRS's failure to conduct that assessment and to disregard economic realities is further evidence of arbitrary rulemaking.

The Executive Orders state that a proposed regulation constitutes a significant regulatory action if it is likely to result in a rule that has "an annual effect on the economy of *$100 million* or more."  Executive Order 12866 at §3(f)(1); 58 Fed. Reg. 51735 (Oct. 4, 1993) (emphasis added).  The Administrative Record amply demonstrates that that the economic impact of the 2012 Amendment substantially would not just exceed $100 million annually, but in fact would result in billions of dollars of capital investment fleeing the U.S. banking system, as commenters explained.  (Alex Sanchez, President and CEO of the FBA) (App. 366); (John Berlau, Director of the Center for Investors and Entrepreneurs at the Competitive Enterprise Institute) (App. 395).

As also noted by Andrew Quinlan, President of the Center for Freedom and Prosperity, "Banks have reported that as much as *$1 trillion* in U.S. deposits are derived from foreign nationals. A shift of even a modest portion of these funds out of the U.S. bank system would certainly be termed

a significant economic impact." (Testimony at the May 18, 2011, IRS Hearing on REG-146097-09 (Reporting Interest Paid to Nonresident Aliens)) (App. 387) (emphasis added).

Against this background, it was implausible for the Treasury Department and IRS to have initially asserted and then to have maintained during the rulemaking process that the 2012 Amendment did not represent a "significant regulatory action." Indeed, that assertion was contrary to the IRS's own data collection system for tracking international capital flows and the expert opinion of industry professionals presented throughout the Administrative Record – to say nothing of Appellants' survey of members on the 2012 Amendment's initial impact.

While the violation of an Executive Order does not give rise to a separately enforceable claim of law, we suggest that it is relevant in pointing out an additional flaw in Appellees' claimed exemption from the APA;s procedural and substantive safeguards that are designed to ensure that regulations are not overly burdensome or harmful to affected parties.

Here, notwithstanding serious concerns from responsible businesspersons, state regulators, and professionals about capital outflow, there is only one solitary sentence in the entire preamble to the 2012 Amendment addressing the issue of capital flight. That response appeared in

the form of a conclusory statement that "legal and administrative safeguards … should adequately address the concerns, and therefore, these regulations should not significantly impact the investment and savings decisions of the vast majority of nonresidents who are aware of and understand these safeguards and existing law and practice." (Cited in full, *supra* at 9, n 2.)

In this instance, the IRS made a decision affecting $400 billion in U.S. bank deposits by attempting to put itself in the mindset of the "vast majority" of nonresident noncitizens located in 70 different countries --- not a single one of whom participated in the rulemaking process. Yet the IRS's apparent presumption is first, that these individuals would have the time, resources, and background knowledge to access, for example, the U.S.-Mexico Tax Treaty and related Conventions; second, that they would then be able to evaluate the documents' contents from the standpoint of U.S. oversight and tax treaty partner compliance; and, third, that the "vast majority" of these individuals would be comfortable with having their name, address, and estimate of overseas bank deposits holding shared between governmental entities.

As explained in a recent *Tax Notes* article, the IRS's approach to this matter was tainted by wrong assumptions:

> The flaws in the IRS's reasoning are apparent. The IRS does not even claim to be making a generalization about the total

45

universe of NRAs with U.S. bank accounts. Instead, it is making an assertion only about "nonresidents who are aware of and understand these safeguards and existing law and practice." As discussed above, it seems reasonable to conclude that most NRAs with U.S. bank accounts will in fact lack that awareness and understanding. Moreover, given the obvious weaknesses in the safeguards and the potential for serious harm to account holders, it was unreasonable for the IRS to assume that "the vast majority" of NRAs who are aware of and understand the safeguards would agree with the IRS that they are adequate to prevent the misuse of information by the foreign government. Patrick J. Smith, "District Court Misapplies APA in *Florida Bankers Association,"* TAX NOTES 747 (Feb. 17, 2014).

An agency cannot simply claim it considered the public comments during a rulemaking if it "says nothing about *how* it evaluated" the matter or "*why* its evaluation led" to one conclusion versus another. *Lilliputian Systems,* 741 F.3d at 1313 (emphasis in original). "The IRS said instead that it was unnecessary to be concerned about capital flight because as a factual matter capital flight would be minimal. Because that conclusion was based on fundamentally flawed reasoning, the district court should have held that the issuance of the regulations violated the arbitrary and capricious standard," TAX NOTES, *supra* at 748, as well as the notice and comment proviso.

5.     The IRS also did not disclose critical factual material for public review in the rulemaking.

Putting aside the IRS's failure to give appreciable attention to the substantive and relevant comments from the public, it also is a clear agency obligation under the APA to "give interested parties an opportunity to participate it the rulemaking process." 5 U.S.C § 553(c). This requires that "critical factual material" used by the agency to be subjected to informed comment and to allow affected parties to use that data in order to support their position. *Chamber of Commerce v. SEC*, 443 F.3d 899, 900 (D.C. Cir. 2006), citing *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991).

Instead of doing that, and supplying the public with key data that bore on the issue at hand, the Treasury Department and IRS omitted from the NPRM their own internal "best estimate" of the total amount of NRA deposits in the United States, and did this even though the Treasury Department possessed this critical number as the government agency tasked with gathering capital flow information through the Treasury International Capital (TIC) System. More precisely, the Administrative Record reveals that Appellees had done their own calculation, based in part on a prior

47

outside analysis of one of the prior NRA reporting proposals,[10] which showed a potential capital exodus of $26.5 billion.

This estimate should also have been included in the NPRM. "To suppress meaningful comment by failure to disclose the basic data relied upon is akin to rejecting comment altogether." *U.S. v. Nova Scotia Food Prods. Corp.*, 568 F.2d 240, 252 (2d Cir. 1977); *see also Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227 (D.C. Cir. 2008).

Appellees, however, failed not only to include this highly probative number but did not even disclose the methodology by which they made the calculations. That is inconsistent with this Court's view that failure to provide an opportunity for comment on [a] model's methodology . . . constitutes a violation of the APA's notice-and-comment requirements." *Owner-Operator Independent Drivers Ass'n, Inc. v. Federal Motor Carriers Safety Admin.,* 494 F.3d 188, 201 (D.C. Cir. 2007).

Appellants suggest that there is an answer as to why both the estimated total amount of NRA deposits and the specific calculations as to the amount at risk of flight did not appear anywhere in the NPRM or in the

---

[10]    Jay Cochran, III "An Economic Analysis of the Proposed IRS Rule Governing the Reporting of Deposit Interest Paid to Nonresident Aliens," WORKING PAPERS IN REGULATORY STUDIES (Mercatus Center at Geo. Mason Univ., March 9, 2004).

explanation and commentary accompanying final adoption of the 2012 Amendment. It would be rather difficult to reconcile a regulation affecting $400 billion in bank deposits and the prospect of $26 billion of capital flight with the certification that the 2012 Amendment was "not a significant regulatory action."

**B.    The 2012 Amendment was also promulgated in violation of RFA**

In addition to erroneously claiming that the 2012 Amendment was "not a significant regulatory action" since it would not have an economic impact in excess of $100 million, Appellees further posited that the 2011 Proposal and 2012 Amendment were "not expected to have a significant economic impact on a substantial number of small entities" under the terms of the Regulatory Flexibility Act ("RFA") (App. 216).   This, too, is arbitrary.

1.    Requirements of the RFA

Congress enacted the RFA in 1980 to ensure that federal agencies consider the needs of small businesses when new regulations are written. The RFA requires an agency promulgating new regulations to "prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. § 603.  "In the case of an interpretative rule involving the internal

revenue laws of the United States, [the RFA] applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement." *Id*.

The RFA further provides that "[w]hen an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis." 5 U.S.C. § 604. The only exception to this requirement is where "the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities." 5 U.S.C. § 605(b). However, if "the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification." *Id*.

The RFA also provides a right of judicial review for any "small entity that is adversely affected or aggrieved by final agency action . . ." 5 U.S.C. § 611(a).

Neither the Treasury Department nor the IRS prepared any regulatory flexibility analysis in conjunction with the 2012 Amendment. Appellees acted on the premise that the IRS Chief Counsel certified that the proposed "will not have a significant economic impact on a substantial number of small entities." (App. 216). This determination is mistaken.

2.  <u>The NPRM used erroneous information in certifying that the RFA was inapplicable.</u>

The IRS used completely erroneous data in terms of ascertaining the number of affected small entities within the entire regulated sector. The NPRM stated that "there were 94,192 commercial banking establishments" and "16,098 savings institutions" in the 2009 U.S. Census Bureau database it relied upon in making its certifications (App. 223) or a universe of 110,290 banks or savings institutions.

In point of fact, however, the FDIC records at the end of 2011 showed

there only to be 6,290 commercial banks and 1,067 savings institutions in the United States for a universe of 7,357 banking entities.

| | Dec. 31, 2011 | |
|---|---|---|
| All Insured Institutions | Commercial Banks | Savings Institutions |
| 7,357 | 6,290 | 1,067[11] |

The District Court dismissed this thousand-fold error on the grounds that the "IRS's decision did not rest on the number of banks implicated." *Florida Bankers Association,* 2014 U.S. Dist. LEXIS 3521, at *22. But surely it does have a serious impact: projected exodus of $26 billion is altogether different if measured over an artificially large base of 111,000 banks versus an actual total of 7,357.

Secondly, the position taken during the NPRM was premised on the IRS view that the "depository accounts, the interest on which is subject to reporting under these regulations, tend to be with larger financial institutions operating in the United States, and therefore the number of small entities that will be required to undertake this collection of information is expected to be limited." 76 Fed. Reg. 1107 (Jan. 7, 2011) (App. 221).

---

[11]   FDIC Quarterly Banking Profile, Fourth Quarter 2011, vol. 6, no. 1 (2012) p. 6.

The IRS's erroneous position was specifically rebutted by the President of the TBA, who pointed out below that "billions of dollars in Texas banks, *especially* community banks, would come under the proposed regulations." (Testimony of J. Eric T. Sandberg, Jr., President and Chief Executive Officer of the TBA, at the Hearing on Proposed Regulations (REG-146097-09) Guidance on Reporting of Deposit Interest Paid to Nonresident Aliens, held before the IRS on May 18, 2011) (emphasis added) (App. 401).

Likewise, the industry trade association with a focus on smaller-sized depository institutions pointed out to the IRS: "I would also reiterate that the IRS's impact assessment of the proposal is based on the flawed assumption that nonresident alien deposits are primarily held at larger institutions. These deposits tend to be geographically based – not based on the size of the institution. Significant foreign deposits are held in community banks and smaller institutions located along the U.S. border. *See* Letter from the Independent Community Bankers of America to Secretary of Treasury Timothy Geithner (July 20, 2011) (App. 405).

Nothing in the Administrative Record supports the IRS's assumption that NRA accounts "tend to be with larger financial institutions." While some accounts are held in larger banks, national and state banking trade

groups testified to that NRA accounts do tend to be placed in smaller institutions. Thus it would have been impossible for the IRS to have conducted any RFA analysis in a reasoned and knowledgeable manner because it was also operating without any breakdown of NRA account information whatsoever with respect to size, location or any other category.

With respect to the cost factors involved, the American Bankers Association took on that burden. It filed an eight-page, single-spaced comment letter fully explaining the onerous, expensive, and time consuming procedures that depository institutions, especially community banks, would have to implement in order to comply with the Amendments.  (App. 292). In so doing, a leading industry trade group, with expertise in this area, pointedly advised the IRS that financial institutions do not currently have systems that can readily adapt to the requirement of the Amendments.  (App. 292).

The IRS response to the ABA and other industry experts was the simple rejoinder that the "Treasury Department and the IRS disagree." (App. 219).  Appellees' Defendants' position relating to the reporting requirements is, once more, utterly conclusory and fail to provide a reasoned response to evidence in the Administrative Record, which demonstrates the collection of

information required by the 2012 Amendment would have a significant economic impact on small entities.

Returning to the RFA, the case law requires an agency to act reasonably and in good-faith. *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutr. Serv*., 416 F. Supp.2d 92, 108 (D.D.C. 2006), citing *United Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001). But here the IRS used materially erroneous data for purposes of defining the RFA universe and then acted on no information whatsoever with respect to the breakdown of NRA deposits among and between the 7,000 FDIC insured banks doing business in the United States.

## CONCLUSION

The foregoing reasons, the 2012 Amendment adopted by the Treasury Department and IRS must be vacated.

_____/s/ James J. Butera_____
Jones Walker LLP
499 S. Capitol Street, SW
Suite 600
Washington, DC 20003
Tel:  (202) 203-1000

_____/s/ Stephen C. Leckar_____
Kalbian Hagerty LLP
888 17th Street, NW
10th Floor
Washington, DC 20006
Tel:  (202) 223-5600

_____/s/ Ryan D. Israel_____
Jones Walker LLP
499 S. Capitol Street, SW
Suite 600
Washington, DC 20003
Tel:  (202) 203-1000

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 10,267 words, as determined by the word-count function of Microsoft Word 2010, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and D.C. Circuit Rule 32(a)(1).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  July 18, 2014

                              /s/ James J. Butera
                              James J. Butera
                              Jones Walker LLP
                              499 S. Capitol Street, SW
                              Suite 600
                              Washington, DC 20003

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Appellate Procedure 25(d), I certify that on this 18th day of July, 2014, the foregoing Brief of Appellants was electronically filed with the Clerk of the Court for the United State Court of Appeals for the District of Columbia Circuit using the CM/ECF system.  I also certify that I caused the original and eight copies to be hand delivered to the Clerk's office.

Service was accomplished on the following by the CM/ECF system, on the following:

> Andrew Weiner, Attorney
> U.S. Department of Justice
> (DOJ) Tax Division, Appellate Section
> Firm: 202-514-3361
> Washington, DC 20044

Two paper copies were dispatched by Federal Express on the following:

> DOJ Appellate Counsel
> U.S. Department of Justice
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

> _____/s/ James J. Butera_____
> James J. Butera
> Jones Walker LLP
> 499 S. Capitol Street, SW
> Suite 600
> Washington, DC 20003

57